**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                              No. 95-5321

RONALD SHERRILL WILKERSON,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Fayetteville.
Malcolm J. Howard, District Judge;
Franklin T. Dupree, Jr., Senior District Judge.
(CR-94-58-H)

Argued: March 4, 1996

Decided: May 24, 1996

Before LUTTIG, Circuit Judge, CHAPMAN, Senior Circuit Judge,
and CLARKE, Senior United States District Judge
for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Senior Judge Clarke wrote the opinion, in which Judge Luttig and Senior Judge Chapman joined.

_____

**COUNSEL**

**ARGUED:** Ronnie Monroe Mitchell, HARRIS, MITCHELL & HANCOX, Fayetteville, North Carolina, for Appellant. David J. Cortes, Assistant United States Attorney, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attorney, Raleigh, North Carolina, for Appellee.

**OPINION**

CLARKE, Senior District Judge:

Ronald Sherrill Wilkerson was convicted by jury of two counts of bank robbery, in violation of 18 U.S.C. §§ 2113 (a) and (d), and two counts of using a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c). In this appeal, he challenges (1) the in-court eyewitness identifications which he claims were tainted by prior suggestive photographic lineups and (2) the trial judge's exclusion of exculpatory hearsay statements. Because the admission of the eyewitnesses' in-court identifications was not plainly erroneous and because the trial judge did not abuse his discretion in excluding the hearsay statements, we affirm.

I

When the sufficiency of evidence to support a conviction is challenged, the relevant facts are viewed in the light most favorable to the government. Accordingly, the facts are as follows.

On March 7, 1994, Wilkerson entered the Centura Bank in Fayetteville, North Carolina, wearing a mask and carrying a satchel in one hand and an automatic pistol in the other. He told one customer to "get down on the floor, this is a robbery." He then approached the head teller, Julie Webb, pointed the gun at her, and handed the satchel over with instructions to fill it with large bills. She told him that she did not have the keys to her teller station, whereupon Wilkerson told her to get them. While Webb went to retrieve the keys, Wilkerson gave the satchel to another teller, Cynthia Barker, saying "fill it up." Barker complied with Wilkerson's request, placing approximately $750 in the bag. Upon her return, Webb deposited another $1500 in the satchel. Wilkerson then walked out the front door and headed towards his waiting car. Barker followed him to the door in order to lock the bank. As she reached the door, she saw Wilkerson take off his mask. He turned and looked at her, thus giving her the opportunity to see both the front and side of his face.

Two customers in the drive-through teller lane saw the robbery and also saw Wilkerson without his mask on. One of these eyewitnesses,

2

Steven Daniels, pulled in front of the getaway car and saw Wilkerson's face, making eye contact with Wilkerson a number of times. The other eyewitness, Carl Pollick, also saw Wilkerson remove his mask. Both Pollick and Daniels chased Wilkerson's car. They described it as a gray or silver Camaro-like sports car with grates on the back window. Daniels only chased Wilkerson for a short time, but Pollick continued the chase, attempting to get a license plate number. The license plate had been flipped over, however. After Pollick lost sight of the car, he remained in the neighborhood, searching for it. Within three to five minutes, he spotted a car which he believed to be the getaway car. This time, the license plate was visible, and, when Wilkerson stopped at a gas station, Pollick wrote down the plate number.

Based upon the license number, the police were able to identify Wilkerson as the owner of the car, but were unable to apprehend Wilkerson. The police did, however, show Daniels and Barker a photographic lineup containing Wilkerson's photo on March 21, 1994. Although neither of them positively identified Wilkerson, Barker stated that he looked familiar to her and Daniels picked Wilkerson's photo as the person who looked like the bank robber. There is no evidence in the record concerning the other pictures in the lineup.

Wilkerson was still at large on May 13, 1994. On that day, the Branch Manager of the State Bank of Fayetteville, John McFayden, saw Wilkerson drive up to the bank wearing a gorilla mask. Wilkerson walked into the bank carrying a Coleman cooler, a pistol visible in his front pocket. He demanded money in large bills; two tellers, Tammy Laughner and Cynthia Landry, handed over money from their cash drawers. Some of the money Landry gave Wilkerson was bait money whose serial numbers had been recorded. Upon returning to his car, Wilkerson removed his mask and looked back at McFayden and Laughner. On May 17, 1994, four days later, both McFayden and Laughner looked at the photographic lineup and stated that Wilkerson's photo closely resembled the robber.

On May 24, 1994, two FBI agents spotted Wilkerson, and after a slow-speed pursuit, began questioning him about his whereabouts on the dates of the two robberies. Wilkerson provided an alibi for the time of each robbery; however, these were later discredited. The

3

agents requested and received Wilkerson's permission to search the car. Under the driver's seat, they found a black plastic case containing 20 five dollar bills. The agents randomly selected some of these bills and found that the serial numbers matched the bait money numbers provided by the State Bank of Fayetteville.[1] Wilkerson was not arrested at this time.

On June 2, 1994, Wilkerson and his aunt went to the Centura Bank to make a deposit. Barker became upset when she saw Wilkerson, believing him to be the bank robber, and called the police. Wilkerson, however, was not arrested until August 26, 1994, following a call to the FBI from McFayden, who had spotted and identified Wilkerson in the lobby of a Holiday Inn.

At trial, Barker and Daniels identified Wilkerson in court as the individual who robbed the Centura Bank on March 7, 1994. McFayden and Laughner also made in-court identifications. Other evidence presented at trial included Wilkerson's possession of the bait money, Pollick's statement about the license plate number, the discrediting of Wilkerson's alibis, and Wilkerson's girlfriend's testimony concerning a cooler of money he had shown her the evening of the second robbery. In addition, FBI agent Parker testified regarding the search of Wilkerson's car and the discovery of the cash under the car seat. On cross-examination, the trial judge refused to allow Parker to be questioned about the statements Wilkerson had made after the search of his car implicating his cousin.

II

Wilkerson first contends that the trial court erred by allowing the eyewitnesses to identify Wilkerson at trial as the robber of the Centura Bank and the State Bank of Fayetteville. He claims that this violated his due process rights because the in-court identifications were tainted by the prior suggestive photographic lineups.

A motion to suppress evidence should be raised prior to trial. Fed R. Crim. P. 12(b)(3). Wilkerson failed to do so. Furthermore,

_____

[1] Later, a comprehensive comparison revealed that 18 of the 20 bills matched the bait money inventory list.

although Wilkerson's attorney did object to the introduction of the prior photographic lineup identifications at trial, he did not do so on the basis of the suggestiveness of the lineup. Instead, he objected to the eyewitnesses testifying about the photographic lineups at trial because they had not positively identified Wilkerson at the time of the lineups.**2** Because Wilkerson's objection to the admission of the photographic lineup evidence on appeal is not the same as his objection at trial, the standard of review is one of plain error. Fed. R. Crim. P. 52(b); see also United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995) (plain error standard applies where appellant did not object to statements made at trial); United States v. Brewer, 1 F.3d 1430, 1434 (4th Cir. 1993) (plain error standard used "where counsel fails to adequately present and preserve an objection on the record"). We find no error in the admission of the in-court identifications.

The Supreme Court has outlined a two-step analysis for determining whether identification testimony is admissible. First, the defendant must establish that the photographic lineup procedure was impermissibly suggestive. Manson v. Braithwaite , 432 U.S. 98, 110 (1977); Neil v. Biggers, 409 U.S. 188, 198-99 (1972); Simmons v. United States, 390 U.S. 377, 384 (1968). Second, even if the procedure was suggestive, the in-court identification is valid if it was reliable. Braithwaite, 432 U.S. at 114; Biggers, 409 U.S. at 199; Willis v. Garrison, 624 F.2d 491, 493 (4th Cir. 1980). The factors the court may consider in measuring reliability include: (1) the witness' opportunity to view the perpetrator at the time of the crime; (2) the witness' degree of attention at the time of the offense; (3) the accuracy of the witness' prior description of the perpetrator; (4) the witness' level of certainty when identifying the defendant as the perpetrator at the time of the confrontation; and (5) the length of time between the crime and the confrontation. Biggers, 409 U.S. at 199-200. These factors are weighed against the "corrupting effect of the suggestive identification itself." Braithwaite, 432 U.S. at 114. Courts may also consider other evidence of the defendant's guilt when assessing the reliability of the in-court identification. See, e.g., United States v Lau, 828 F.2d 871, 875 (1st Cir. 1987) (court relies on fact that one defendant had license

_____

**2** The trial judge instructed counsel that inconsistent statements went to the probative value of the testimony and should be discredited by counsel through cross-examination.

5

to fly the plane in question, another was nearby the site where the transaction occurred, and the witness used the defendants' correct names when first describing them to the authorities, to support the reliability of the witness' identification of the defendants), cert. denied, 486 U.S. 1005 (1988); United States v. DiTommaso, 817 F.2d 201, 214 n.17 (2d Cir. 1987) (even if the identification was unreliable, error was harmless where evidence as a whole was overwhelming); United States v. Bell, 812 F.2d 188, 193 (5th Cir. 1987) (identification may be reliable in the context of all the circumstances and evidence).

In this case, Wilkerson has failed to establish that the photographic lineup was impermissibly suggestive. The lineup was not made a part of the appellate record, the district court has not ruled on the issue, and the only evidence of suggestibility is Wilkerson's bare assertion that the other photos did not look like the perpetrator as described by the witnesses.**3** Consequently, Wilkerson fails the first part of the analysis.

Furthermore, assuming arguendo that the photographic array was impermissibly suggestive, Wilkerson's argument would still fail because the in-court identifications were reliable. All the witnesses saw Wilkerson's face in broad daylight while their full attention was focused on him. The witnesses' prior descriptions were fairly accurate. The witnesses who identified Wilkerson at trial were positive of their in-court identification. In addition, it is unlikely that the photos had a corrupting effect on the in-court identifications. None of the witnesses positively identified Wilkerson from the photographic lineup, perhaps due to the poor quality of the photos as described by both parties. There was no evidence that the photos were shown repeatedly to the witnesses or that the police emphasized Wilkerson's photo. See Simmons, 390 U.S. at 383 (danger of misidentification is heightened if defendant's picture is emphasized or recurs in lineup). Under these circumstances, we cannot say that "there is a substantial likelihood of irreparable misidentification." Id. at 384. Finally, the

_____

**3** During oral argument, Wilkerson's attorney claimed that the photos were of poor quality and that only one of the photos, the one of Wilkerson, resembled the perpetrator as described by the witnesses. The government agreed that the photos were of poor quality, but stated that the individuals in the photos were similar in appearance.

6

fact that two of the witnesses, Barker and McFayden, upon observing Wilkerson in public, were so certain that he was the bank robber that they called the authorities, also lends substantial support to the reliability of the identifications. Accordingly, because Wilkerson has failed to show both that the photographic lineup was impermissibly suggestive and that the witnesses' testimony was unreliable, Wilkerson's due process rights were not violated by the in-court identifications.

III

Wilkerson also alleges that the district court erred in prohibiting him from eliciting, on cross-examination of Agent Parker, exculpatory statements he had made explaining how he had acquired the bait money. Wilkerson claims that the trial judge should have allowed in this testimony under the rule of completeness. A trial judge's evidentiary decisions are reviewed for abuse of discretion. United States v. Hassan El, 5 F.3d 726, 731 (4th Cir. 1993), cert. denied, 114 S. Ct. 1374 (1994).

The common-law doctrine of completeness has been partially codified in Rule 106 of the Federal Rules of Evidence. [4] Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 171-72 (1988). The rule applies only to writings or recorded statements, not to conversations. Fed. R. Evid. 106, advisory committee notes; United States v. Bigelow, 914 F.2d 966, 972 (7th Cir. 1990), cert. denied, 498 U.S. 1121 (1991). Thus, Wilkerson's reliance on the rule is misplaced. Furthermore, when the rule does apply, its purpose is to prevent a party from misleading the jury by allowing into the record relevant portions of the excluded testimony which clarify or explain the part already received. United States v. Ricks, 882 F.2d 885, 893 (4th Cir. 1989), cert. denied, 493

_____

[4] The rule provides that:

> [w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Fed. R. Evid. 106.

7

U.S. 1047 (1990); Merrick v. Mercantile-Safe Deposit & Trust Co., 855 F.2d 1095, 1103-04 (4th Cir. 1988); United States v. Jamar, 561 F.2d 1103, 1108 (4th Cir. 1977). In this case, during direct examination Agent Parker testified that the agents found a black case containing some of the bait money while searching Wilkerson's car. No other testimony about any portions of a conversation between the agents and Wilkerson regarding that particular cache of money was introduced. Thus, the rule of completeness, if it applied to oral conversations, would not have applied here where there was no partially-introduced conversation that needed clarification or explanation.

The evidentiary rules which properly govern the admissibility of Wilkerson's exculpatory statements are contained within the hearsay rule and the exceptions thereto. See Fed. R. Evid. 801, 802, 803, and 804. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Admissions by a party-opponent are not considered hearsay and therefore can be admitted against that party. Fed. R. Evid. 801(d)(2). Thus, during direct examination, the government could have introduced inculpatory statements made by Wilkerson. The rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party. See Fed. R. Evid. 803-804. Moreover, even if, as Wilkerson claims, Rule 106 had applied to this testimony, it would not render admissible the evidence which is otherwise inadmissible under the hearsay rules. See United States v. Woolbright , 831 F.2d 1390, 1395 (8th Cir. 1987) (neither Rule 106 or Rule 611 authorizes a court to admit unrelated hearsay when that hearsay does not fall within one of the exceptions to the hearsay rule). Consequently, because the exculpatory statement in question here was pure hearsay and no exception enumerated in the rules permit its introduction, the trial judge did not abuse his discretion in prohibiting its admission.

IV

Wilkerson's counsel has filed a brief pursuant to Anders v. California, 386 U.S. 738 (1967). Counsel has requested this Court to review the record for any basis for appeal that he may have over-

8

looked. In accordance with <u>Anders</u>, we have examined the record and have found no basis for appeal.

V

Finding no error in either the admission of the in-court identifications or the trial court's exclusion of exculpatory hearsay statements, Wilkerson's conviction is

<u>AFFIRMED</u>.

9