Rehearing granted in part and case remanded
for resentencing under Booker on March 8, 2005

**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 03-4379

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DERRELL LAMONT GILCHRIST,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Deborah K. Chasanow, District Judge. (CR-02-245-DKC)

Submitted: October 27, 2004          Decided: January 11, 2005

Before NIEMEYER and LUTTIG, Circuit Judges, and HAMILTON, Senior Circuit Judge.

Affirmed by unpublished per curiam opinion.

Douglas Wood, ROBERTS & WOOD, Riverdale, Maryland, for Appellant. Thomas M. DiBiagio, United States Attorney, Deborah Johnston, Assistant United States Attorney, Sandra Wilkinson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

PER CURIAM:

Derrell Lamont Gilchrist appeals from a district court judgment following his conviction and sentencing for three counts of armed bank robbery, 18 U.S.C. § 2113(d), one count of carjacking, id. § 2119, one count of conspiracy to engage in a bank robbery and a carjacking, id. § 371, four counts of using a firearm during and in relation to a crime of violence, id. § 924(c), and one count of possessing a firearm after having a felony conviction, id. § 922(g). We affirm.

I

A

Between March 15, 2001 and July 13, 2001, Gilchrist engaged in a series of violent offenses in the District of Maryland and elsewhere. Gilchrist's involvement in these offenses was established through eyewitness and victim testimony, results of forensic examinations, including fingerprint and DNA comparisons, documents, and other evidence.

On March 15, 2001, Gilchrist, acting alone, masked and armed with a gun, entered a Columbia Bank branch located in Greenbelt, Maryland. Before Gilchrist entered the bank, the branch manager saw Gilchrist outside the bank without a mask. In the hallway outside the bank's lobby, Gilchrist, wearing a mask, encountered a customer who had already left the bank and demanded at gunpoint

2

that the customer return to the bank and get on the floor. Gilchrist then demanded money by pointing the gun at tellers and customers. Gilchrist forcibly took federally insured United States currency. As he left the bank, Gilchrist stated, "Have a Merry Christmas." Gilchrist was then observed by the branch manager and others fleeing across the parking lot and entering a black Jeep Cherokee.

In a photographic lineup, the Columbia Bank branch manager identified Gilchrist as the person she saw outside the bank on the date of the robbery. Bank surveillance photographs depicted the robber as short and stocky, which matched Gilchrist's physical build.

On April 25, 2001, Gilchrist robbed another bank, this time a Bank of America branch in Mitchellville, Maryland. Gilchrist, masked and armed with a gun, entered the bank and demanded money by pointing the gun at tellers and customers. Gilchrist forcibly took federally insured United States currency. As he left the bank, Gilchrist was heard saying, "Have a blessed day" and "Have a Merry Christmas."

Gilchrist was observed fleeing from the bank and running behind a shopping center located adjacent to the bank parking lot. A construction worker at the rear of the shopping center observed the robber fleeing and observed him get entangled in some bushes. A black nylon skull cap and a twenty-dollar bill were recovered in

that same area of the bushes. A DNA comparison was done and Gilchrist was determined to be the major contributor of the DNA found on the skull cap.

Gilchrist's next heist occurred on June 15, 2001 at a Sun Trust Bank branch in Landover Hills, Maryland. Gilchrist and a taller, thinner African-American man were observed by Matilda Burgos, a bank customer, in the bank's parking lot. Burgos made eye contact with Gilchrist and watched Gilchrist and his accomplice walk to the bank door, where she observed one of the men pulling out a gun before entering the bank. As described by witnesses and depicted in the bank surveillance photographs, both robbers displayed guns and wore bandannas covering their faces. They demanded and received United States currency. One of the robbers grabbed the keys to a customer's minivan. Both robbers fled in the stolen minivan, which was later recovered a short distance from the bank.

On July 13, 2002, Gilchrist and a taller, thinner African-American man approached Raymond Redden at 1441 McCormick Drive in Landover, Maryland and demanded his vehicle. Unbeknownst to Gilchrist and his accomplice, Redden was a Prince George's County police officer, recently assigned to the narcotics unit, and the vehicle was his undercover police vehicle. After Redden relinquished his keys by putting them on the front seat, Gilchrist told Redden to get on the ground because he was going to "cap him."

4

Gilchrist and Officer Redden then struggled for the gun. In the midst of the struggle, Gilchrist discharged his weapon but was unable to fire it again because Redden had his hand over the slide portion of the gun, thereby jamming the casing inside. During this struggle, Gilchrist instructed his accomplice to kill Redden. The accomplice tried to come closer to the two men, but was unable to get a clear shot. Gilchrist and his accomplice fled the scene in Redden's unmarked police vehicle.

A high-speed chase ensued. A short time later, Gilchrist and his accomplice abandoned the unmarked police vehicle and escaped on foot. However, the police were able to recover Officer Redden's vehicle. Fingerprints recovered on the driver's side exterior of the vehicle were identified as belonging to Gilchrist. During a search of the vehicle, a pager not belonging to Redden was recovered.[1]

A photographic lineup was shown to Officer Redden, who identified Gilchrist as the shorter of the two carjackers and the one who tried to shoot him. Redden was also shown another photographic lineup and identified another photograph as depicting

---

[1]The pager recovered from Officer Redden's vehicle belonged to Syretta Smith, a prostitute whom Gilchrist robbed at gunpoint on or about July 8, 2001. Smith was shown a photographic lineup and identified Gilchrist as the man who robbed her of her money and pager. Smith also identified a second photograph as the man who assisted Gilchrist in robbing her.

the tall, thin man who was Gilchrist's accomplice in the carjacking.[2]

Less than two hours after the carjacking of Officer Redden, Gwendolyn Day was walking from a Seven-Eleven convenience store to a Chevy Chase Bank branch in Arlington, Virginia to join her sister who was inside the bank.  As she crossed the parking lot, Day observed two men, one short and stocky, the other tall and thin, running toward the front of the bank.  Nothing was covering their faces.

Moments later, when Day was inside the bank, the same short, stocky man, whom she identified in court as Gilchrist, and his tall, thin accomplice entered the bank.  Both were wearing bandanna masks and carrying guns.  Gilchrist demanded money by pointing the gun at tellers and customers, adding that he would "execute them" if they did not follow his orders.  Gilchrist and his accomplice forcibly took federally insured United States currency.

While fleeing from the scene of the bank robbery in his Jeep Cherokee, Gilchrist failed to yield the right of way and nearly collided with another car.  The other driver became angry and followed Gilchrist, who sped away.  After obtaining the Cherokee's license-plate number, the driver who was following Gilchrist

---

[2]Of note, the person identified by Officer Redden as Gilchrist's accomplice in the carjacking was not the same person that Smith identified as Gilchrist's accomplice during the July 8, 2001 robbery of Smith.

6

returned to the Chevy Chase Bank branch and provided the information to the police.

Later, Gilchrist abandoned his Jeep Cherokee at a government office building in Washington, D.C. The vehicle was found on July 17, 2001 and, inside the vehicle, the police recovered dye-stained money, a bullet, and a bullet casing. On July 19, 2001, Gilchrist was apprehended, following a vehicular chase with a Washington, D.C. police officer.

B

On July 26, 2002, a grand jury sitting in the District of Maryland returned a superseding indictment charging Gilchrist with four counts of armed bank robbery, 18 U.S.C. § 2113(d), one count of carjacking, id. § 2119, one count of conspiracy to engage in a bank robbery and a carjacking, id. § 371, five counts of using a firearm during and in relation to a crime of violence, id. § 924(c), and one count of possessing a firearm after having a felony conviction, id. § 922(g). On January 7, 2003, the case went to trial. After eight days of trial, the jury returned a verdict finding Gilchrist guilty of all of the counts except one of the armed bank robbery counts and one of the § 924(c) counts.[3] On

_____

[3]In the superceding indictment, the government alleged that Gilchrist, armed with a firearm, robbed a Potomac Valley Bank branch on June 21, 2001. This allegation formed the basis of one of the armed bank robbery counts and one of the § 924(c) counts. The jury acquitted Gilchrist on the counts related to the alleged robbery of the Potomac Valley Bank branch.

7

April 25, 2003, the district court sentenced Gilchrist to 112 years' imprisonment and ordered restitution in the amount of $54,595. Gilchrist noted a timely appeal.

## II

Gilchrist contends that he was improperly denied access to evidence favorable to his defense in violation of Brady v. Maryland, 373 U.S. 83 (1963). More specifically, he contends he was entitled to know the name of the individual that Officer Redden identified in the photographic lineup as Gilchrist's accomplice in the carjacking. With this information, Gilchrist posits, he would have been able to impeach Redden's testimony by demonstrating that the person Redden identified in the photograph as Gilchrist's accomplice did not, in fact, participate in the carjacking or any of the bank robberies, thereby undermining the government's theory of the case.[4]

In Brady, the Supreme Court held that the prosecution's failure to disclose favorable evidence to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. In order to establish that the

_____

[4]The government's decision to refuse to disclose the name of the person that Officer Redden identified in the photographic lineup as Gilchrist's accomplice in the carjacking primarily was based on privilege and confidentiality concerns--its investigation into the identity of Gilchrist's accomplice was ongoing.

government's failure to turn over evidence constitutes a <u>Brady</u> violation, the defendant must demonstrate: (1) that the undisclosed evidence was favorable, either because it was exculpatory or impeaching; (2) that the prosecution had the materials and failed to disclose them, either willfully or inadvertently; and (3) that the evidence was material to the defense. <u>Strickler v. Greene</u>, 527 U.S. 263, 280-81 (1999). Evidence is "material" for purposes of the <u>Brady</u> inquiry "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). A "'reasonable probability' is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> Thus, although "the term '<u>Brady</u> violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence--that is, to any suppression of so-called 'Brady material'-- . . . strictly speaking, there is never a real 'Brady violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." <u>Strickler</u>, 527 U.S. at 281.

In denying Gilchrist's request for the government to disclose the name of the person that Officer Redden identified in the photographic lineup as Gilchrist's accomplice in the carjacking, the district court engaged in a lengthy colloquy with counsel.

During this colloquy, the court observed that, because the government had doubts concerning the accuracy of Redden's identification of Gilchrist's accomplice in the carjacking, the government was not contending that the person Redden identified in the photographic lineup participated in any of the crimes alleged in the indictment.[5] The court also observed that, in view of the strong physical evidence linking Gilchrist to the carjacking, Gilchrist did not seriously take issue with Redden's identification of Gilchrist as a participant in the carjacking. In light of these two observations, the court viewed Gilchrist's request as one that sought evidence to prove a fact the government did not dispute, namely, the man Redden identified in the photographic lineup as Gilchrist's accomplice was not the same individual who participated in the carjacking or any of the bank robberies. Put simply, the essence of the court's ruling was that Gilchrist's request did not seek impeaching or exculpatory evidence because (1) the name of the accomplice was irrelevant to any issue in the case and (2) there were other persuasive ways to prove the inaccuracy of Redden's identification without disclosure of the name of the accomplice.

---

[5]Although the government had doubts concerning the accuracy of Officer Redden's identification of Gilchrist's accomplice in the carjacking, the government did suggest to the court, and ultimately argued to the jury, that the accomplice in the carjacking, whomever that person might be, assisted Gilchrist in performing some of the bank robberies.

In our view, Gilchrist's Brady claim founders for the simple reason that the identification evidence he sought was not material. Given the certainty of Officer Redden's identification of Gilchrist, the presence of Gilchrist's fingerprint on the outside of Redden's vehicle in the area where the struggle occurred, the subsequent discovery of Smith's pager in Redden's vehicle, her identification of Gilchrist as the person who stole her pager, and the fact that the government was not contending that the person Redden identified in the photographic lineup participated in any of the crimes alleged in the indictment, it simply cannot be said that disclosure of the identity of the accomplice in the carjacking would have produced a different result at the trial. Accordingly, there was no Brady violation.

In a related argument, Gilchrist contends that the district court should have conducted an in camera review of the evidence concerning Officer Redden's identification of Gilchrist's accomplice in the carjacking. According to Gilchrist, such a review was necessary because the court was obligated to determine whether the government possessed information concerning the accuracy of Redden's identification of Gilchrist's accomplice.

On occasion, the government may possess potential Brady material that it deems privileged or that is otherwise confidential. If the accused does not specifically request that it be produced, this material is treated much like everything else in

11

the government's file, i.e., "the prosecutor's decision on disclosure is final." Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987). If, however, the defendant is able to identify the requested confidential material with some degree of specificity, he may then attempt to convince the district court that it is subject to disclosure. Id. at 58 n.15 (requiring the accused to "at least make some plausible showing" of how the evidence would be "both material and favorable to his defense").

Once the defendant has made a plausible showing that the evidence would be both material and favorable, the district court must review the evidence in camera to ascertain its true nature and determine whether it must be disclosed. Id. at 58-60. The court conducts its examination in private because the Constitution does not accord a defendant the right of unrestricted access to the government's files. Id. at 59-60. The court's ultimate conclusion as to whether the information is subject to disclosure--whether the evidence is both material and favorable--may be disturbed on appeal only if it is clearly erroneous. United States v. Trevino, 89 F.3d 187, 190 (4th Cir. 1996).

In this case, Gilchrist suggests that he satisfied the "plausible showing" requirement because disclosure of the name of the carjacking accomplice possibly would have led to admissible evidence. However, mere speculation that the information may be helpful is insufficient to justify an in camera review. United

12

States v. Mitchell, 178 F.3d 904, 907-08 (7th Cir. 1999). In any event, it is difficult to see how the name of the carjacking accomplice was favorable and/or material because Gilchrist simply did not need the name of the accomplice to impeach Officer Redden's credibility. Gilchrist could have attacked Redden's credibility by presenting evidence that the accomplice identified by Redden in the photographic lineup had not been charged with any of the crimes alleged in the indictment. Presentation of such evidence would have been equally, if not more, powerful than any evidence Gilchrist could have marshaled through the disclosure of the name of Gilchrist's accomplice in the carjacking. Accordingly, Gilchrist's claim that the district court erred by failing to conduct an in camera review is without merit.

III

Gilchrist also contends that the district court erred when it admitted into evidence two in-court identifications of him, one by Matilda Burgos, the other by Gwendolyn Day.

When considering whether in-court identification evidence is admissible, the district court employs a two-step analysis. The court first determines whether the defendant established that the identification procedure was unnecessarily suggestive. United States v. Wilkerson, 84 F.3d 692, 695 (4th Cir. 1996). Second, if the identification procedure was unnecessarily suggestive, the

13

court must determine whether the identification evidence nevertheless is reliable. Id. In determining the reliability of the identification evidence, the court considers a number of factors, specifically: (1) the witness's opportunity to see the defendant at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's description; (4) the witness's level of certainty; and (5) the time between the crime and the confrontation. Id. These factors are weighed against the "corrupting effect of the suggestive identification itself." Manson v. Brathwaite, 432 U.S. 98, 114 (1977).

Gilchrist contends that the in-court identification of him by Burgos violated his due process rights. Specifically, he alleges that Burgos's in-court identification was unnecessarily suggestive and unreliable because: (1) during a court recess just prior to her testimony, Burgos arrived in the courtroom, took the stand, saw Gilchrist, and advised counsel she recognized Gilchrist; and (2) Burgos was shown bank surveillance photographs prior to her testimony.

With regard to Gilchrist's first contention concerning Burgos's in-court identification of him, we have held that giving a witness an opportunity to observe the defendant in court is not an unnecessarily suggestive identification procedure. See United States v. Murray, 65 F.3d 1161, 1169 (4th Cir. 1995) ("[A]lthough the Government allowed the witnesses to see [the defendant] seated

14

at the defense table prior to their testimony, it did not create a substantial likelihood of irreparable misidentification" because the witnesses "would have seen [the defendant] at the defense table immediately before testifying."). Under this court's holding in Murray, allowing Burgos to see Gilchrist at counsel's table a few moments before her testimony did not make the identification procedure unnecessarily suggestive, as Burgos would have seen Gilchrist in any event a few moments later when she took the witness stand.

Gilchrist also contends the in-court identification of him by Burgos violated his due process rights because Burgos was shown bank surveillance photographs prior to her testimony. As the argument goes, a due process violation occurred because the government falsely told the district court that Burgos had been shown "no pictures" of Gilchrist when, in fact, she had been shown the bank surveillance photographs depicting Gilchrist wearing a mask. This argument is without merit for the simple reason that the government's statement was true in the sense that Burgos was not shown any pictures which identified Gilchrist; rather, she only was shown pictures of Gilchrist wearing a mask.

In any event, Burgos's identification of Gilchrist was reliable and therefore admissible. An in-court identification is admissible if the witness has independent knowledge which attenuates the inherently suggestive environment of a courtroom

15

identification of a single defendant. Murray, 65 F.3d at 1169 (identification based upon witness's "clear recollection of [defendant] during the robbery"); United States v. Johnson, 732 F.2d 379, 381 (4th Cir. 1984) (identification based upon an opportunity to view the defendant at a time other than in the courtroom). Burgos's trial testimony clearly satisfies that requirement because she had an independent basis for her identification of Gilchrist.

As established at trial, on June 15, 2001, after completing her banking business and saying hello to her sister, Burgos left the Sun Trust Bank branch. As she walked toward her vehicle, Burgos observed two men, one covered with a mask and the other wearing a jacket, walking toward her vehicle. Burgos entered her vehicle and locked the door because she was afraid of the men. She only saw the suspect with the mask for a moment. Burgos, however, saw the face of the other suspect, whom she identified in court as Gilchrist. Moreover, she watched the men walk up to the bank door, at which time one of them pulled out a gun and both entered the bank. Burgos observed them for approximately thirty-five seconds. As she was driving away from the bank parking lot, Burgos called the police to report the incident. Burgos was not interviewed during the initial investigation and was first contacted by the FBI in December 2002. Burgos was shown the bank surveillance photographs in which both suspects wore masks and, therefore, as

16

Burgos testified, she could not see their faces or identify them in the photographs. Burgos did testify, however, that the body builds and the clothing worn by the suspects in the bank surveillance photographs matched the builds and clothing of the suspects whom she had seen in the parking lot.

Based upon her opportunity to observe Gilchrist, her level of concentration, and her degree of certainty exhibited during her testimony, Burgos's in-court identification of Gilchrist was reliable and properly admitted. Cf. Coleman v. Alabama, 399 U.S. 1, 5-6 (1970) (affirming admissibility of in-court identification by a witness who had a fleeting but good look at his assailant in the headlights of a passing car, thereby finding an independent basis for the in-court identification).

Gilchrist also argues that the in-court identification of him by Gwendolyn Day, a customer at the Chevy Chase Bank branch in Arlington, Virginia was unreliable. Gilchrist asserts that the in-court identification was inadmissible because: (1) Day had an insufficient opportunity to view Gilchrist at the time of the robbery; (2) she improperly observed the bank surveillance photographs prior to her testimony; and (3) she was tentative in her in-court identification of Gilchrist.

Day testified that, as she was going to the bank on the day of the robbery, she observed two unmasked men running in her direction from across the street. She noticed that one was thin and the

17

other was heavy-set.  Day described the manner in which the heavier person ran.  Day entered the bank moments later to join her sister who was inside the bank and almost immediately felt someone behind her.  Although he was now masked, Day could see his eyes and recognized him from his physical appearance as the same person she had observed about five seconds earlier running across the street.  Day saw the man pull out a silver gun, order everyone on the floor, and threaten to start executing the customers unless he got some money.

In preparation for her trial testimony, Day reviewed bank surveillance photographs to identify her location and the location of others in the bank during the robbery.  Both robbers were armed and wore bandannas covering their faces in those bank photographs.

During her trial testimony, Day looked in the direction of Gilchrist, which precipitated the following exchange between the government and Day:

GOVERNMENT: Why are you looking in that direction?

MS. DAY: Because he -- he looks like the guy I seen coming across the street.  Because I looked -- see when I seen him coming across, you know, the bus went by, and I thought they were just running for the bus.

After identifying Gilchrist as the person that she was looking at in the courtroom, Day stated, "He looks like the guy that came across the street, the one standing there with the gun in his hand [in the bank]."

In this case, based on Day's opportunity to view the robber's face as he ran across the street, her opportunity to see his eyes moments later inside the bank while he was directing everyone to the floor and threatening to execute the bank customers, the impact such an event had upon her, and the unsolicited nature of her in-court identification of Gilchrist, it is clear that her identification of Gilchrist was based upon her recollection of the bank robbery and not the result of any inherently suggestive atmosphere in the courtroom. Accordingly, the court did not err in admitting the evidence. Cf. United States v. Peoples, 748 F.2d 934, 936 (4th Cir. 1984) (holding that an identification can be reliable even if it is phrased in uncertain terms).

IV

Gilchrist also raises three additional arguments that he contends should be resolved in his favor. First, he argues that the bank robbery and carjacking counts were improperly joined in the indictment and, therefore, the district court erred when it denied his motion for severance. Second, Gilchrist argues that the court erred when it refused to allow him to introduce evidence concerning a shooting incident that did not involve him, but did involve Officer Redden. Finally, Gilchrist argues that Redden made false statements at trial or, alternatively, that the government knowingly utilized false testimony. We have reviewed all of these

19

arguments and find them to be without merit.  Accordingly, for the reasons stated herein, the judgment of the district court is affirmed.

<u>AFFIRMED</u>