**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

v.

DANIEL I. COLTON,
　　　　　*Defendant-Appellant.*

No. 01-6562

UNITED STATES OF AMERICA,
　　　　　*Plaintiff-Appellee,*

v.

DANIEL I. COLTON,
　　　　　*Defendant-Appellant.*

No. 01-4348

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Benson E. Legg, District Judge.
(CR-97-377-L)

Argued: January 24, 2002

Decided: February 25, 2002

Before WILKINS, LUTTIG, and MICHAEL, Circuit Judges.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Jonathan D. Hacker, O'MELVENY & MYERS, L.L.P.,
Washington, D.C., for Appellant. Dale Preston Kelberman, Assistant

United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Walter E. Dellinger, Jeremy Maltby, O'MELVENY & MYERS, L.L.P., Washington, D.C., for Appellant. Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Daniel I. Colton appeals the denial of his motion for a new trial, which alleged that the Government withheld information that could have been used to impeach its key witness. We affirm.

I.

A.

In 1998, a jury found Appellant Daniel Colton guilty of conspiracy, *see* 18 U.S.C.A. § 371 (West 2000), and three counts of bank fraud, *see* 18 U.S.C.A. § 1344 (West 2000). Colton's convictions arose from transactions involving a corporation called Colton and Laskin (C&L), which Colton co-owned with Dennis Laskin. Laskin also participated in the schemes giving rise to Colton's convictions; as a result, he was charged with and pled guilty to bank fraud and concealing assets from the Resolution Trust Corporation, *see* 18 U.S.C.A. § 1032 (West 2000). The proceedings against Laskin, including his sentencing, concluded before Colton was indicted. Laskin then served as a key witness against Colton.

After Colton was convicted but before sentencing, he moved for a new trial on the basis of newly discovered evidence. *See* Fed. R. Crim. P. 33. He maintained that, prior to and during his trial, the Government was investigating a Laskin-owned company called AIS. Col-

ton asserted that the existence of this investigation should have been disclosed as impeachment evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

The district court reserved decision on this motion and entered judgment against Colton, and Colton appealed. This court vacated two of the three bank fraud convictions for reasons not relevant here, but otherwise affirmed. *See United States v. Colton*, 231 F.3d 890, 908-10, 912 (4th Cir. 2000).

While Colton's appeal was pending, proceedings regarding his Rule 33 motion continued in the district court. Ultimately, the district court denied this motion and Colton's accompanying request for discovery. Colton now seeks review of this order.

### B.

In order to resolve Colton's claim, we must examine the underlying facts in some detail. Laskin founded AIS "to enable foreign nationals to obtain permanent residency in the United States through investments." J.A. 242. AIS and its clients sought to take advantage of a law making immigrant visas available to foreign investors who provided at least $500,000 to establish businesses employing 10 or more people in the United States. *See* 8 U.S.C.A. § 1153(b)(5) (West 1999). Laskin recruited several former officials from the State Department and the Immigration and Naturalization Service (INS) to promote this enterprise.

According to newspaper articles furnished by Colton in support of his Rule 33 motion, AIS came under scrutiny for two reasons. First, for much of the 1990s, the INS allowed AIS and other companies to obtain visas for clients who had not yet invested the minimum amount required by § 1153(b)(5). *See* William Branigin, *INS Probes Md. Firm in Possible Visa Fraud*, Washington Post, Jan. 8, 1999, at A3; Walter F. Roche Jr. & Gary Cohn, *INS Insiders Profit on Immigrant Dreams*, Baltimore Sun, Feb. 20, 2000, at 24A-25A. Second, there were questions about whether AIS actually used the money it received from clients to support job-creating businesses. *See* Branigin, *supra*; Roche & Cohn, *supra*, at 26A.

These concerns resulted in two separate probes of AIS. The first investigation was precipitated by a *qui tam* suit filed in 1996 by a former AIS employee. The complaint does not appear in the record, but a news report stated that the relator who initiated the suit alleged that AIS not only sought visas for clients who had not made the requisite investment but also delivered only a small proportion of its clients' funds to needy businesses; of the remaining funds, a portion was placed in escrow and the rest was kept by AIS as compensation for its services.[1] *See* Roche & Cohn, *supra*, at 26A.

When the *qui tam* action was filed, the Government opened an investigation to determine whether to intervene. *See* 31 U.S.C.A. § 3730(b)(2) (West Supp. 2001). The investigators ultimately determined that AIS had disclosed the relevant business practices to the INS. In addition, the relator revealed to investigators that he had very little knowledge about AIS practices. The Government consequently opted not to intervene. An Assistant United States Attorney advised the INS of this decision in a letter mailed the same day that Laskin was sentenced for his participation in schemes involving C&L.

After the Government's decision, the relator dismissed his suit without prejudice. At that point, according to the relator's attorney, none of the *qui tam* defendants had been served with the complaint or otherwise informed of its contents. Furthermore, the senior vice president of AIS at the time of the Government's investigation averred that he had no knowledge of any inquiry into AIS practices.

The Government's second investigation of AIS was opened in response to an anonymous letter that accused AIS of "'selling' . . . visas through mail fraud, internet fraud and personal face to face pitchmen." J.A. 698. The letter further alleged that the companies supported by clients' investments were "phony corporations that were computer generated." *Id.* Although this investigation began in September 1998, the Government did not issue its first subpoena until

---

[1] Colton contends that "the allegation of wrongdoing was that Laskin had set up false companies that did not actually employ the requisite ten people." Br. of Defendant-Appellant at 29 n.6. Allegations of this nature arose later, but there is no evidence that the *qui tam* complaint alleged such conduct.

October 21, 1998, two days after Laskin completed his testimony in Colton's trial. Ultimately, the investigation was

> administratively closed. No charges have been filed or are contemplated against AIS or any individual associated with that company at this time. Dennis Laskin was never advised he was personally a target or subject of the investigation. No evidence was uncovered that Dennis Laskin personally made any false statements or representations to the INS.

*Id.* at 700.

## II.

Colton contends that the district court erred in ruling that the Government's failure to disclose these two investigations did not violate due process. He further asserts that the court should have reviewed the Government's investigatory materials *in camera* or allowed Colton to examine them.

## A.

A claim arising under *Brady* and its progeny has three elements: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether willfully or inadvertently; and (3) it must be material." *Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 555 (4th Cir. 1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (internal quotation marks omitted). We hold that none of the evidence described in Colton's *Brady* complaint meets this standard.[2]

---

[2]Colton asserts that the district court used the wrong standard when it ruled that *Brady* does not apply to "preliminary, challenged, or speculative information." J.A. 62 (internal quotation marks omitted). Colton is correct that evidence may be subject to disclosure under *Brady* even if its reliability has not been conclusively established. If nothing else, mere

Colton offers four unpersuasive theories of materiality. The first theory is that the investigations created a motive for Laskin to lie on the witness stand. There is no evidence, however, that Laskin was ever aware of the investigations or even had any suspicion that they might be undertaken. Moreover, the burden of producing evidence on this issue lay with Colton, not the Government.[3] *See United States v. Stokes*, 261 F.3d 496, 502 (4th Cir. 2001), *petition for cert. filed*, No. 01-7296 (U.S. Nov. 15, 2001).

Colton's next theory is that the undisclosed evidence suggested an inappropriate relationship between Laskin and the prosecutor. According to Colton, the prosecutor curtailed his investigation of AIS in order to preserve Laskin's credibility for Colton's trial, "despite the qualms of INS' [sic] officials." Br. of Defendant-Appellant at 34. This theory fails for several reasons. First and foremost, it is not the task of the jury to assess the motivations of the prosecutor. Also, the "qualms" referred to arose from the actions of the INS, not any attempt by AIS to mislead the INS. *See* Roche & Cohn, *supra*, at 26A (quoting an INS memorandum concluding that the INS had granted applications that, on their face, did not comport "the letter or spirit" of § 1153(b)(5) (internal quotation marks omitted)). Moreover, there is nothing suspicious about the prosecutor's decision to terminate his

---

allegations may be fodder for cross-examination. *See United States v. Bowie*, 198 F.3d 905, 909 (D.C. Cir. 1999). On the other hand, there is a correlation between the materiality of exculpatory information and the extent to which that information has been verified. *See id.* at 911 (noting that prior conviction for perjury would have impaired witness' credibility more than perjury investigation).

[3]Colton suggests that Laskin's awareness of the first investigation can be inferred from the parallel timelines of the investigation and Laskin's plea and sentencing. In particular, Colton notes that "Laskin's prosecutor did not formally decline intervention in the *qui tam* action immediately, but waited until the very day that Laskin was sentenced." Br. of Defendant-Appellant at 28-29. But it was not "Laskin's prosecutor" who opted not to intervene; it was another Assistant United States Attorney. Also, even if the prosecutor was involved in the decision not to intervene, and even if the Office of the United States Attorney deferred a final decision on this matter pending Laskin's sentencing, this does not establish that Laskin was aware of the investigation.

investigation upon determining that the conduct challenged in the *qui tam* suit (as described in news reports) was fully disclosed to the INS and was consistent with INS policy.

In his third and fourth theories, Colton asserts that the evidence in question would have helped the defense to prove Laskin's dishonest tendencies and his predilection for using innocent associates to further fraudulent schemes. Of course, the mere fact that Laskin was investigated reveals nothing at all about him. Instead, the allegations underlying the investigations may have had value, but only to the extent that Colton could have used those allegations during cross-examination or introduced evidence tending to prove the allegations. We have reviewed the materials provided in the joint appendix and we conclude that there is no reasonable likelihood that disclosure of the allegations against Laskin would have altered the outcome of Colton's trial.

In all of the materials within the joint appendix, there is only one item that might have been useful to the defense—the statement of an investigator that AIS clients admitted that their investments were not being used to create real companies with at least 10 employees. *See* Branigin, *supra*. If AIS in fact set up dummy corporations to create the appearance of compliance with § 1153(b)(5), this would amount to a serious fraud. Nevertheless, we perceive no *Brady* violation because the record does not establish either that the Government received its information from AIS clients before Colton's trial ended or that the outcome of the trial would have been affected by this evidence. As to Laskin's character for truthfulness, this evidence that Laskin *might* have been involved in a fraud involving AIS was cumulative to, and less probative than, the admission that Laskin had already been convicted of fraud in connection with the activities of C&L. Furthermore, such evidence would not have meaningfully reinforced Colton's assertion at trial that Laskin had manipulated him into participating unwittingly in fraudulent transactions involving C&L. According to a news report, an anonymous official reported that investigators "are 'finding blatant fraud,' although not with the direct involvement of the high-powered board members listed on [AIS] brochures." Branigin, *supra*. This allegation does not demonstrate manipulation by Laskin; indeed, it does not mention Laskin at all. Moreover, even if Laskin did manipulate the "high-powered" individ-

uals associated with AIS, it does not follow that he could have done the same to Colton, whose involvement in C&L was far more extensive than merely being "listed on . . . brochures." Thus, this evidence would not have materially assisted Colton's defense. We therefore hold that the district court did not err in denying Colton's motion for a new trial.

B.

Colton next asserts that he was entitled to have the district court review the Government's files *in camera* to determine whether they contained *Brady* evidence. He also contends that the court should have granted him access to those files. We disagree.

At the outset, we reject Colton's request for direct access to the Government's files regarding its investigations of AIS. Colton does not claim an absolute right to such access; instead, he asserts that it was within the discretion of the district court to order disclosure as a form of discovery. Assuming for purposes of decision that this is correct, we hold that the court did not abuse its discretion. In light of the many reasons for maintaining confidentiality in the course of investigations, only an extraordinary showing by the defendant would justify *carte blanche* access to investigatory files. No such showing has been made here.

Whether the district court should have reviewed the files *in camera* presents a closer question. To establish the right to such review, a defendant must make a "plausible showing" that the Government's files contain information that "would be both material and favorable to his defense." *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995) (internal quotation marks omitted). Colton asserts that his "plausible showing" here consists of his more general demonstration that the Government withheld exculpatory evidence, combined with the prosecutor's admission that he did not review all the relevant files. As discussed above, however, there is no evidence that any material information favorable to Colton was withheld during Colton's trial. Furthermore, the record does not support Colton's assertion that the prosecutor never examined the relevant files.[4] Accordingly, we find

---

[4]In the district court, a Government memorandum made the following representation concerning the prosecutor's inspection of investigatory

no error in the refusal of the district court to conduct an *in camera* review.

### III.

For the foregoing reasons, we affirm the decision of the district court denying Colton's motion for a new trial.

*AFFIRMED*

---

files:

> Prior to Colton's trial, counsel for the government requested and obtained from the investigating agents copies of all of their memoranda of witness interviews, investigative reports, documentary evidence, and related materials. Thus, there was no reason for government counsel to review those same materials in the files of the FBI and IRS.

J.A. 551. Colton construes the phrase "those same materials" to imply that the FBI and IRS files also contained other materials. We believe, however, that the more natural interpretation is that review of the actual files was unnecessary because copies of everything in them had already been delivered to the prosecutor.