**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-4704

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JUNAIDU SALJAN SAVAGE, a/k/a James Kamara,

Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt. George L. Russell, III, District Judge. (8:15-cr-00076-GLR-1)

Argued: December 7, 2017                    Decided: March 12, 2018

Before GREGORY, Chief Judge, and KEENAN and FLOYD, Circuit Judges.

Affirmed by published opinion. Judge Floyd wrote the opinion in which Chief Judge Gregory and Judge Keenan joined.

**ARGUED:** Alyssa Christine Pont, SHEARMAN & STERLING LLP, Washington, D.C., for Appellant. Ray Daniel McKenzie, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee. **ON BRIEF:** Philip Urofsky, SHEARMAN & STERLING LLP, Washington, D.C., for Appellant. Stephen M. Schenning, Acting United States Attorney, Thomas P. Windom, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.

FLOYD, Circuit Judge:

Junaidu Savage was convicted by a jury of one count of bank fraud conspiracy and two counts of aggravated identity theft. He now appeals his conviction and sentence on several grounds. First, he argues that the district court erred in denying his motion for judgment of acquittal based on insufficient evidence of bank fraud conspiracy. Second, Savage argues that the district court erred in failing to conduct an *in camera* review to determine whether material required disclosure under the Jencks Act, 18 U.S.C. § 3500(b), or pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Third, Savage argues that the district court erred by not providing his requested jury instruction on accomplice testimony, and by providing the jury with a written copy of the jury instruction on aiding and abetting liability. Finally, Savage challenges the district court's application of the sentencing guidelines on several grounds. For the following reasons, we affirm.

I.

Between January and April 2012, Junaidu Savage, Jayad Conteh, and others devised a scheme to defraud Capital One Bank ("Capital One"). According to the trial testimony, Savage and a mutual friend, Mumtaz Sadique, recruited Conteh—a teller at a Capital One branch—to participate in the scheme. At Savage's direction, Conteh used her position as a teller to access customer account information on the bank's internal systems, including confidential personal identifiers necessary to make changes to an account, for accounts that contained at least $10,000. She would then send the account information to Savage or Sadique using her cell phone or by passing hard copies of the

2

customer information. Many of these communications were with an iPhone with the number ending in 7412, which was registered to the mother of one of Savage's children. Conteh also answered questions about the accounts via text message. For each account Conteh provided information about, Savage and his co-conspirators then called Capital One, changed the contact phone number on the account, and tried to order checks to be delivered by overnight mail. These calls to Capital One were recorded and introduced into evidence. Conteh and Alimamy Jabbie, one of Savage's close friends, later identified Savage's voice on several of these phone calls.

A fraud investigator testified that Conteh accessed at least seven victims' accounts on multiple occasions without authorization. The evidence showed that the conspirators obtained checkbooks for at least one account, and wrote and cashed checks to empty the victim's account. The bank eventually detected the scheme, and was able to thwart the conspirators' efforts to compromise accounts by requiring customers to provide a password or physically come into the branch to conduct transactions.

Conteh was arrested in April 2012 and was later convicted by a jury, sentenced to an aggregate term of 64 months of imprisonment, and ordered to pay $36,000 in restitution. Following her conviction, Conteh entered into a proffer agreement with the government to provide information about the conspiracy on the condition that the information she provided would not be used directly against her. The government met with Conteh four times as part of this agreement. During this period, Savage spoke to Conteh, sent her money for a new lawyer, and sent her text messages, including a message saying, "It was never my intention, I'm sorry" the day she reported to prison.

J.A. 606. In summer 2014, Savage visited Conteh's family and discussed his involvement in the fraud; unbeknownst to Savage, this conversation was videotaped. In this recording, Savage stated:

> I was somehow involved and I will not try to exclude myself but it was not intended for [Conteh] to end up in this situation . . . . [E]ven though this was a small thing that we did, it has turned out to be something big that we never imagined. . . . Today I am here but I could have found myself in the same situation where she is too. Because I was part of it, you understand? . . . We made a big mistake and we can only look up to God to see how certain thing [sic] will turn out. . . . I am willing to help as much as I can. The restitution is $36,000.00 and I will not hesitate to pay for it. I don't think I made over $8,000.00 on it but I am not looking at that because I was part of it.

J.A. 139.

On February 25, 2015, a federal grand jury for the District of Maryland indicted Savage for bank fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One), and aggravated identity theft, in violation of 18 U.S.C. § 1028A (Counts Two and Three). In March 2016, Conteh and the government changed their proffer agreement to a cooperation agreement in which the government agreed to move for a reduction of her sentence if she adhered to their agreement and provided substantial assistance in their case against Savage in light of the factors set forth in U.S.S.G. § 5K1.1, including potentially testifying against him. In anticipation of Conteh's testimony, the government provided Savage with required disclosures containing potential impeachment evidence that summarized inconsistent statements Conteh made during their meetings with her. The inconsistencies concerned matters such as the minimum balance Conteh should look for when targeting an account and whether Conteh received any money from the scheme.

4

On the first day of trial, Savage filed a motion to compel any materials related to interviews of Conteh or other witnesses which may contain required disclosures under either the Jencks Act, 18 U.S.C. § 3500(b), or *Brady v. Maryland*, 373 U.S. 83 (1963). The court dismissed the motion as moot after finding that only the government attorney's personal notes existed, and determining that they did not contain any required disclosures. At trial, Conteh testified to several details of the scheme. For example, she described how Savage and Sadique approached her about the plan, how Savage directed her to access bank accounts, and how she communicated the confidential customer account information to Savage. The prosecution and defense both questioned Conteh about her previous inconsistent statements.

Savage moved for a judgment of acquittal at the close of the government's case and at the close of evidence; the district court denied both motions. Savage also requested a specific jury instruction on accomplice testimony, which the district court declined to provide. The jury then requested and was provided a written copy of the jury instruction on aiding and abetting liability, which was charged in connection with the aggravated identity theft counts. The jury subsequently convicted Savage on all counts. Savage then moved for a new trial, which the district court also denied.

At the sentencing hearing, the district court sentenced Savage to a within-Guidelines sentence of a total of 87 months of imprisonment—51 months as to Count One for bank fraud conspiracy, and a mandatory consecutive 24 months each for Counts Two and Three for aggravated identity theft, of which 12 months were to run concurrently. Savage was also sentenced to three years of supervised release and ordered

5

to pay restitution of $36,400, $300 in special assessments, and forfeiture of substitute property. This appeal followed.

## II.

We first address Savage's contention that the district court erred in denying his motion for judgment of acquittal based on insufficient evidence of bank fraud conspiracy. We review the denial of a motion for judgment of acquittal de novo. *United States v. Gillion*, 704 F.3d 284, 294 (4th Cir. 2012). "We will uphold the verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence," which is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.* at 294 (internal quotation marks & citations omitted). "A defendant who brings a sufficiency challenge bears a heavy burden, as appellate reversal on grounds of insufficient evidence is confined to cases where the prosecution's failure is clear." *United States v. Clarke*, 842 F.3d 288, 297 (4th Cir. 2016) (internal quotation marks, citations & alterations omitted).

Savage asserts that there is insufficient evidence that he took any participatory action in the bank fraud conspiracy such that a rational factfinder could conclude that he was a knowing and willing participant in the scheme. We disagree. When considering the evidence in the totality, we conclude that there was sufficient evidence to convict Savage of the charges against him. "[T]he law in this Circuit is well settled that uncorroborated testimony of an accomplice may be sufficient to sustain a conviction."

6

*United States v. Manbeck*, 744 F.2d 360, 392 (4th Cir. 1984). "[O]n appeal, we are not entitled to assess witness credibility, and we assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Taylor*, 659 F.3d 339, 343 (4th Cir. 2011) (internal quotation marks omitted). Conteh, a co-conspirator, testified as to Savage's involvement in the conspiracy and the steps he took to plan and carry out the scheme. Conteh also provided direct testimony that the phone number used in connection with the scheme—the number ending in 7412—belonged to "Jay," which was what she called Savage. J.A. 518. Additionally, she testified it was Savage's voice on the recorded Capital One phone calls. This testimony was further supported by the testimony of Alimamy Jabbie, one of Savage's close friends, who testified that the voice on the Capital One recordings sounded like Savage's, although he was "not too sure for a hundred percent . . . ." J.A. 822–23. The jury heard Conteh's testimony, along with any alleged inconsistencies, and decided that her testimony was credible. Thus, Conteh's testimony alone is sufficient to support his conviction.

The government, however, also introduced videotape evidence of Savage discussing his participation in the scheme with Conteh's family after she was arrested. In this recording, Savage made statements including, "I could have found myself in the same situation where she is too. Because I was part of it, you understand?"; "[w]e made a big mistake"; and "I will not hesitate to pay for [Conteh's restitution]. I don't think I made over $8,000.00 on it but I am not looking at that because I was part of it." J.A. 139. Savage argues that this evidence is insufficient because his statements never explicitly reference the bank fraud conspiracy or his participation in it. However, in reviewing the

7

denial of a motion for judgment of acquittal, "[w]e 'consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established,' and we assume that the jury resolved all contradictions in the testimony in favor of the Government." *United States v. Pettiford*, 337 F. App'x 352, 355 (4th Cir. 2009) (first quoting *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982); and then citing *United States v. Brooks*, 524 F.3d 549, 563 (4th Cir. 2008)). This video evidence allowed the jury to make the reasonable inference that Savage was referring to the bank fraud scheme and his participation in it.

Consequently, we conclude that Savage's conviction was supported by substantial evidence and that the district court did not err in denying his motion for judgment of acquittal.

III.

We now turn to Savage's contention that the district court erred in failing to conduct an *in camera* review to determine whether the material gathered by the government in its meeting with Conteh, recorded in the prosecutor's personal notes, was subject to required disclosure under either the Jencks Act or *Brady*. Under the Jencks Act, 18 U.S.C. § 3500(b), on a motion by the defendant, the government is required to produce any "statement" of the witness related to the witness's testimony that is in the government's possession. Pursuant to *Brady*, it is a due process violation for the government to suppress evidence that is material and favorable to the defendant. *Brady*, 373 U.S. at 87. Savage specifically asserts that the district court was required to review

8

the government attorney's personal notes from the prosecution's meetings with Conteh *in camera* to determine whether Conteh made any additional inconsistent statements that would qualify as required disclosures and could be used to further impeach her testimony. "Whether, and to what extent, the material sought must be produced are questions of fact to be decided by the district court and will not be overturned unless clearly erroneous." *United States v. Boyd*, 53 F.3d 631, 634 (4th Cir. 1995) (citation omitted); *see also United States v. King*, 628 F.3d 693, 702 (4th Cir. 2011) ("In reviewing the district court's denial of [a] *Brady* motion, we review its legal conclusions *de novo* and its factual findings for clear error." (citation omitted)). We conclude that the district court did not err.

A.

The Jencks Act provides that on a motion by the defendant after a witness for the government has testified on direct examination, the district court must order the government to "produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b). In pertinent part, the Jencks Act defines "statement" to include both "a written statement made by said witness and signed or otherwise adopted or approved by him," § 3500(e)(1), and "a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously," § 3500(e)(2). The district court is required to conduct an independent inquiry of the materials to determine whether the material must be disclosed. *Boyd*, 53 F.3d at 634. However, "[d]istrict courts have 'substantial latitude' in deciding what this inquiry will entail." *Id.*

9

(quoting *United States v. Smith*, 31 F.3d 1294, 1301 (4th Cir. 1994), *cert. denied*, 513 U.S. 1181 (1995)). "[A] defendant must provide some foundation for his Jencks Act request before the district court is required to make an *in camera* inspection." *Id.* (citation omitted). "Such a foundation, typically established through cross examination of the witness whose statement the defendant is attempting to obtain, requires the defendant to specify with reasonable particularity that material which may be a Jencks Act statement exists." *Id.* (citation omitted).

Relatedly, in *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." 373 U.S. at 87. To prove a *Brady* violation, a defendant must show that non-disclosed evidence was favorable to the defendant, material, and that the prosecution had the evidence and failed to disclose it. *Moore v. Illinois*, 408 U.S. 786, 794–95 (1972). Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (internal quotation marks omitted).

Before a court must conduct an *in camera* review to determine whether there is a *Brady* violation, "a defendant must make a 'plausible showing' that the Government's files contain information that 'would be both material and favorable to his defense.'" *United States v. Colton*, 38 F. App'x 119, 124 (4th Cir. 2002) (quoting *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995)). "[M]ere speculation that the information may be helpful is insufficient to justify an *in camera* review." *United States v. Gilchrist*, 119 F.

10

App'x 485, 491 (4th Cir. 2005) (citation omitted). In making this showing, a defendant must "identify the requested confidential material with some degree of specificity." *Id.* (quoting *United States v. Trevino*, 89 F.3d 187, 189 (4th Cir. 1996)); *see also King*, 628 F.3d at 703 (stating that although the defendant is not always required to "make a particular showing of the exact information sought and how it is material and favorable" before becoming entitled to an *in camera* review, this Court requires "some plausible showing that exculpatory material exists" (internal quotation marks omitted)).

In sum, an *in camera* review is only required under the Jencks Act if the defendant provides a proper foundation for the request, and is only required under *Brady* if the defendant makes a plausible showing that the files contain evidence that is material and favorable to the defense.

## B.

We now turn to our analysis of whether the district court erred by not undertaking an *in camera* review of the prosecutor's notes. Savage asserts that he believes Conteh made additional inconsistent statements that could be used to further impeach her testimony, based on the inconsistent statements the government already disclosed. We conclude, however, that Savage did not meet his burden under either the Jencks Act or *Brady* to require the court to conduct an *in camera* review of the materials.

When making his motion to compel production, Savage did not even attempt to argue that a Jencks Act statement existed or that the defense was entitled to view the prosecutor's personal notes, he "just wanted for the record to request anything in writing that is contemporaneous evidence of that interview." J.A. 231; *see also* J.A. 232 ("I don't

11

have any authority for work product to request [the prosecutor's notes]."). Savage did not question Conteh on cross-examination about whether she reviewed these notes or adopted any statements contained within, and has not made any representations that Conteh adopted or approved any part of these notes. Similarly, Savage has not made any representation that the notes include a "substantially verbatim recital" of Conteh's statements. He also has not made assertions about what additional inconsistent statements exist—only that they might exist and any additional inconsistencies would be material as impeachment evidence. This is insufficient to provide the required foundation under the Jencks Act to require the court to conduct an *in camera* review.

Savage has also failed to make a plausible showing that the files contain evidence that is material and favorable to the defense to require an *in camera* inspection under *Brady*. Savage argues that he can assume the government attorney's notes contain other inconsistencies in Conteh's testimony because of the inconsistencies already disclosed and because of the government's admissions that there were "inconsistencies all the way through" their meetings with Conteh, J.A. 229, and that "other things were discussed" in the meetings, Appellant's Br. 35. He also argues that additional impeachment evidence "could have reasonably undermined the jury's view of [Conteh's] credibility and thus very likely the result of the trial." Appellant's Br. 35. This is pure speculation lacking any specificity, and is insufficient to support a finding of materiality under *Brady* or to require an *in camera* review. Additionally, these personal notes were used to create the summaries of Conteh's inconsistent statements that were disclosed to Savage. These summaries, along with the disclosure letters, were heavily relied on during Savage's

12

cross-examination of Conteh. Thus, Savage has not made a plausible showing that not having the government attorney's actual notes prevented the defense from effectively cross-examining Conteh or otherwise materially impacting Savage's defense.

Consequently, we hold that Savage was not entitled to an *in camera* review of these materials under either the Jencks Act or *Brady*. Because we conclude that the district court was not required to conduct an *in camera* review of the government attorney's notes, and because we give the court substantial latitude in deciding how to conduct the inquiry into whether disclosures are required, we also hold that the district court did not clearly err in failing to conduct a more thorough inquiry into whether disclosures were required under either the Jencks Act or *Brady*.

IV.

Next, we turn to Savage's argument that the district court erred by not providing his requested jury instruction on accomplice testimony, and by providing the jury with a written copy of the jury instruction on aiding and abetting liability. We reject each argument in turn.

A.

Savage argues that the district court abused its discretion by providing the part of the model jury instruction emphasizing that a jury may rely on accomplice testimony without providing the rest of the model instruction warning that such testimony must also be viewed with caution. We disagree.

We review both "the decision to give (or not to give) a jury instruction and the

13

content of an instruction . . . for abuse of discretion." *United States v. Russell*, 971 F.2d 1098, 1107 (4th Cir. 1992). When jury instructions are challenged on appeal, the key issue is "whether, taken as a whole, the instruction fairly states the controlling law." *United States v. Cobb*, 905 F.2d 784, 789 (4th Cir. 1990) (citation omitted). "A district court's refusal to provide an instruction requested by a defendant constitutes reversible error only if the instruction: (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." *United States v. Lewis*, 53 F.3d 29, 32 (4th Cir. 1995) (internal quotation marks & citations omitted).

Savage requested that the following part of the model instruction be included in the court's jury instruction on accomplice testimony: "However, it is also the case that accomplice testimony is of such nature that it must be scrutinized with great care and viewed with particular caution when you decide how much of that testimony to believe." Appellant's Br. 37 (quoting 1-7 *Modern Federal Jury Instructions—Criminal*, ¶7.01, Instruction 7-5 (Matthew Bender ed., 2016)). In relevant part, the jury was instructed regarding accomplice testimony and witness credibility as follows:

> You should bear in mind that a witness who has entered into such agreement *has an interest in the case* different than ordinary witnesses. *A witness who realizes that she may be able to obtain her own freedom or receive a lighter sentence by giving testimony favorable to the prosecution has a motive to testify falsely. Therefore, you must examine her testimony with caution and weigh it with great care.*
>
> If, after scrutinizing her testimony, you decide to accept it, you may give it whatever weight, if any, you find that it deserves.

14

. . . .

*If you believe that the witness was motivated by hopes of personal gain, was the motive one which would cause her to lie*, or was it one which would cause her to tell the truth?

. . . .

You in turn may accept the testimony of such a witness. You are instructed that you may convict a defendant on the basis of this testimony alone *if it convinces you of the defendant's guilt beyond a reasonable doubt*.

. . . .

In weighing the testimony of witnesses, you should *consider his or her relationship to the government* or to the defendant, *his or her interest, if any, in the outcome of the case . . . .*

. . . .

*It is legitimate for an attorney to seek to discredit or impeach a witness by, among other things, demonstrating that all or part of the witness's testimony is materially false. Likewise, an attorney may seek to impeach a witness by demonstrating that the witness made a prior inconsistent statement.* This is done by showing that before trial, the witness made a statement that is inconsistent with or contradicts the witness's trial testimony.

*If you find that a witness has been impeached, you must decide what impact, if any, the impeachment has on the believability of the witness's testimony. The believability of the witness is for you and for you alone to decide.*

. . . .

In a trial, *evidence that a witness is biased or prejudiced or hostile towards a defendant requires the jury to view that witness's testimony with caution, to weigh it with great care, and to subject it to close and searching scrutiny.*

J.A. 880–83, 917, 918 (emphases added). Savage contends that the instruction provided

15

was insufficient because it related "only to witnesses with plea agreements and general witnesses, neither of which squarely applied to Ms. Conteh."  Reply Br. 15.

Savage's attempts to distinguish accomplice witnesses from all witnesses is unavailing.  We conclude that the district court substantially covered Savage's requested instruction because it warned the jury to scrutinize all witness testimony, especially the testimony of biased or hostile witnesses, and specifically instructed the jury that it could take prior inconsistent statements into account when considering witness credibility. Therefore, we hold that the district court did not abuse its discretion in declining to provide Savage's requested instruction on accomplice testimony.

B.

Savage also argues that the district court abused its discretion by providing a "one-sided and suggestive partial instruction to the jury," thereby causing prejudice, when it first declined the jury's request for a written copy of all jury instructions but then acceded to the jury's request for a written copy of the aiding and abetting liability instruction. Appellant's Br. 41.  We disagree.

We review challenges to jury instructions for abuse of discretion.  *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995).  "The particular words chosen, like the decision whether to issue any clarification at all, are left to the sound discretion of the district court."  *Id.*  "[T]he district court's duty is simply to respond to the jury's apparent source of confusion fairly and accurately without creating prejudice."  *Id.* (citing *United States v. United Med. & Surgical Supply Corp.*, 989 F.2d 1390, 1407 (4th Cir. 1993)).

During deliberations, the jury asked the district court to provide a written set of

16

jury instructions. After the court stated that it was not its practice to provide written instructions and that it was not comfortable providing its copy, which included the judge's interlineations, the jury requested that the district court provide the written instruction on aiding and abetting, which was charged in connection with the aggravated identity theft counts. The district court provided this requested written instruction to the jury, without any interlineations.

Savage argues that providing only the aiding and abetting instruction prejudiced him by emphasizing this basis of conviction without taking measures to dilute any undue suggestiveness. This argument is unavailing. The court has discretion whether and how to respond to the jury's requests and here, the district court responded to the jury's request for a written instruction on aiding and abetting by providing that instruction. *See United States v. Ehrlich*, 902 F.2d 327, 330 (5th Cir. 1990) ("A trial court generally may limit a supplemental charge to the specific instruction requested by the jury. As we have said before, there is no error if the trial judge in supplemental instructions charges exactly as he was requested." (internal quotation marks omitted)); *see also Smith*, 62 F.3d at 646 (rejecting defendant's claims that supplemental instructions offered on a conspiracy charge were confusing, imbalanced, and prejudicial by stating that the instruction "was a fair and accurate statement of the law" and that defendant's challenge must fail because he "was not legally entitled to anything more"). Additionally, the jury had previously been instructed that they were "to consider all of [the] instructions as a whole" and "regard each instruction in light of all of the others," providing an additional safeguard against any prejudice. J.A. 907. We therefore hold that the district court did not abuse its

17

discretion in providing the jury a written instruction on aiding and abetting.

V.

Finally, we turn to Savage's arguments that the district court erred in applying the sentencing guidelines. We review a sentence imposed by a district court for reasonableness, applying a deferential abuse of discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). When reviewing a district court's application of a sentencing guideline, we review factual findings for clear error and legal conclusions de novo. *United States v. Manigan*, 592 F.3d 621, 626 (4th Cir. 2010). Under the clear error standard, we will only reverse if "left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985) (internal quotation marks omitted).

A.

First, Savage argues that the district court erroneously applied a 2-level sentencing enhancement for obstruction of justice. The U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 3C1.1 (U.S. Sentencing Comm'n 2016) provides for a 2-level enhancement when a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction . . . ." The enhancement applies when a defendant "provid[es] materially false information to a judge or magistrate judge" or "to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1 cmt. n.4(F), (H). Before applying a sentencing enhancement for

18

obstruction of justice, the court must find by a preponderance that the defendant: "(1) gave false testimony; (2) concerning a material matter; (3) with the willful intent to deceive (rather than as a result of confusion, mistake, or faulty memory)." *United States v. Jones*, 308 F.3d 425, 428 n.2 (4th Cir. 2002) (citations omitted); *see also United Sates v. Dunnigan*, 507 U.S. 87, 94 (1993). Information is "material" when, "if believed, would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1 cmt. n.6. "In order to have acted willfully within the meaning of this guideline, a defendant must consciously act with the purpose of obstructing justice." *United States v. Romulus*, 949 F.2d 713, 717 (4th Cir. 1991) (internal quotation marks omitted).

The sentencing court also "must specifically identify the perjurious statements and make a finding either as to each element of perjury or 'that encompasses all of the factual predicates for a finding of perjury.' " *United States v. Akinkoye*, 185 F.3d 192, 205 (4th Cir. 1999) (quoting *United States v. Gordon*, 61 F.3d 263, 270 (4th Cir. 1995)); *see also Dunnigan*, 507 U.S. at 95 (providing an example of acceptable specificity when the court stated that "the defendant was untruthful at trial with respect to material matters," and that this untruthfulness was "designed to substantially affect the outcome of the case"). "[C]lose calls should be resolved 'in favor of extending deference to the trial court[s]' where they hold the institutional advantage." *United States v. Andrews*, 808 F.3d 964, 969 (4th Cir. 2015) (quoting *Miller v. Fenton*, 474 U.S 104, 114 (1985)).

Savage argues that the district court did not find the materiality of the perjurious testimony with sufficient specificity, and that it erred in finding that the statements were willful and material. We disagree. Savage's alleged perjurious statements were made

19

during his interviews with pretrial services and were introduced in his pretrial detention hearing, which included a determination of whether Savage presented a risk of flight or nonappearance such that pretrial release should be denied. The district court found that Savage "misrepresented and lied to Pretrial Services about his address, about where he lived, possessing and presenting state licensing documents that were false, and about his international travel." J.A. 2420. Specifically, the record indicates that Savage stated that he lives in Maryland without mentioning his Ohio address or residency (as indicated by his Ohio driver's license); did not mention that he possessed an Ohio driver's license that had the name Junaidu Savage and his picture and address on it when another driver's license with the name Junaidu Savage and an address on the same street had a picture of his friend, and that his friend's license was issued before the one in Savage's possession; and concealed his international travel to Sierra Leone where he has family and assets. At the sentencing hearing, the district court stated, "I think that there was no confusion or mistake" as to each lie, J.A. 2421, and also stated that these findings were "the basis of why he is being held right now, because of the material misrepresentations," J.A. 2418. The district court also described how each lie contributed to the assessment of pretrial release.

Although broad, these statements satisfy the requirement for the district court to specifically identify the perjurious statements and make a finding that encompasses all factual elements of perjury. *Compare United States v. Smith*, 681 F. App'x 205, 210 (4th Cir. 2017) ("While the district court's factual findings were somewhat abbreviated, we believe the court's statements, when considered together and in context, sufficiently

20

'encompass[] all of the factual predicates for a finding of perjury.' " (quoting *Dunnigan*, 507 U.S. at 95)), *with Smith*, 62 F.3d at 647 (holding that the court failed to make the required findings of perjury when it only stated "Well, I will deny the objection to the increase for obstruction of justice").

With no procedural error in stating the findings, we review the findings themselves for clear error. Here, the district court did not clearly err in finding that Savage's possession and presentment of a false driver's license was perjurious, warranting an obstruction of justice sentencing enhancement. Savage has not presented any evidence to challenge the district court's findings that his driver's license was a false identity, and that he presented it with the willful intent to deceive. Additionally, there is no doubt that a defendant presenting false identification is material to whether the defendant is a flight risk and should be denied pretrial release.

Consequently, we hold that the district court did not err in applying the 2-level sentencing enhancement for obstruction of justice. As only one perjurious statement is necessary to apply this sentencing enhancement, we decline to address the other alleged perjurious statements regarding Savage's residency, address, and international travel.

B.

Savage next argues that the district court erroneously applied a 10-level sentencing enhancement based on the amount of loss. U.S.S.G. § 2B1.1(b)(1) provides that a sentencing court is obliged to calculate the offense level for a defendant convicted of a crime involving fraud or deceit on the basis of the amount of loss resulting from the scheme. *See Elliott v. United States*, 332 F.3d 753, 767 (4th Cir. 2003). Loss amount "is

21

the greater of actual loss or intended loss." U.S.S.G. § 2B1.1(b) cmt. n.3(A). "Intended loss" is "the pecuniary harm that the defendant purposely sought to inflict," including "intended pecuniary harm that would have been impossible or unlikely to occur . . . ." U.S.S.G. § 2B1.1(b) cmt. n.3(A)(ii); *see also United States v. Miller*, 316 F.3d 495, 502 (4th Cir. 2003). The amount of loss is a factual determination, and a sentencing court need only make a "reasonable estimate of loss, given the available information," as supported by a preponderance of the evidence. *Miller*, 316 F.3d at 503 (internal quotation marks omitted); *see also* U.S.S.G. § 2B1.1(b) cmt. n.3(C) (stating that the court "need only make a reasonable estimate of the loss" that is "based on available information"). We review the district court's legal interpretation of the term "loss" under the sentencing guidelines de novo, *Miller*, 316 F.3d at 498, and review the calculation and amount of loss for clear error, *United States v. Castner*, 50 F.3d 1267, 1274 (4th Cir. 1995).

Here, the district court found that the loss was approximately $186,000, based on a calculation of the total funds in each of the seven intended victims' accounts at the time Conteh first accessed the account information in the Capital One system. The district court applied a 10-level sentencing enhancement based on its finding that the loss calculation exceeded $150,000 but was less than $250,000. This was the same loss calculation used to sentence co-conspirator Conteh.

Savage argues that the district court erred in calculating the amount of intended loss in two ways: (1) in interpreting "loss" to include the balances in bank accounts for which the conspirators failed to get checkbooks; and (2) in using the account balances

22

from the date on which Conteh first accessed each account's information, instead of using the date on which Savage "possessed" access to each account by obtaining a checkbook. We disagree.

The district court did not err in including the balances in bank accounts for which the conspirators failed to get checkbooks in its calculation of intended loss because a lack of success in an attempted fraud scheme does not preclude a court from including the intended loss from the failed attempts in its calculation. This is especially true when, as here, the conspirators had already taken steps to steal from these specific victims, and their efforts were thwarted by a third party—here, when Capital One discovered the fraud and prevented the conspirators from obtaining checkbooks to these accounts. *See United States v. Anderson*, 532 F. App'x 373, 380 n.2 (4th Cir. 2013) (including losses that were avoided when the IRS identified the fraudulent activity and stopped the tax refunds from being issued to the defendant); *United States v. Kalili*, 100 F. App'x 903, 906 (4th Cir. 2004) (upholding inclusion of intended losses when the bank detected the fraudulent checks and the checks were never deposited). Thus, under these facts, the district court did not err in including the balance from the accounts that Savage and his co-conspirators unsuccessfully attempted to access in its loss calculation.

The district court also did not clearly err in using the account balances from the date Conteh first accessed the accounts to calculate intended loss. The sentencing court need only make a "reasonable estimate of loss, given the available information." *Miller*, 316 F.3d at 503. "We need not determine whether the district court's estimate was the *most* reasonable; rather, we need only determine whether the method used to calculate the

23

amount of loss . . . bears some reasonable relation to the actual or intended harm of the offense." *United States v. Minor*, 831 F.3d 601, 607 (5th Cir. 2016) (emphasis in original) (internal quotation marks omitted) (holding that it was reasonable for the court to calculate intended loss by determining the average actual loss of accounts breached and multiplying by the total number of accounts defendant intended to access). We conclude that it was reasonable to calculate intended losses based on the account balance on the date the account was accessed and selected for victimization, and the date the process to obtain a checkbook for that account began. Consequently, we hold that the district court did not err in applying the 10-level sentencing enhancement for the loss calculation.

C.

Savage also argues that the district court erred in applying a 2-level sentencing enhancement based on use of sophisticated means. "Whether a defendant's conduct involved sophisticated means is a factual inquiry that we review for clear error." *United States v. White*, 850 F.3d 667, 675 (4th Cir. 2017) (citation omitted). U.S.S.G. § 2B1.1(b)(10)(C) provides for a 2-level enhancement when "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means . . . ." Each of the defendant's individual actions need not be sophisticated to warrant the enhancement, and "a defendant need not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (citation omitted); *see also United States v. Jackson*, 346 F.3d

24

22, 25 (2d Cir. 2003) ("[T]he total scheme was sophisticated in the way all the steps were linked together so that [the defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way." (citation omitted)). However, an enhancement can only be applied when there is proof of complexity beyond the "minimum conduct required to establish a violation of 18 U.S.C. § 1344 in its simplest form." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014) (internal quotation marks omitted).

Savage argues that the district court clearly erred in applying the sophisticated means enhancement because there was only evidence of Savage using one phone in furtherance of the conspiracy, and that the other evidence indicated the scheme was merely the minimum conduct required for bank fraud conspiracy, and thus cannot be the basis for the conviction.* We disagree. The government presented evidence that Savage hid assets, hid transactions, hid his own name, had phones registered in multiple states (none in his name), directed actions of several other conspirators, used insider information provided by a co-conspirator bank employee, and used that information in coordinated steps to circumvent the bank's fraud countermeasures and take over the

---

* Savage relies heavily on this Court's opinion in *Adepoju* to argue that the Court found clear error in applying a use of sophisticated means enhancement for more sophisticated means than the facts in this case. *See Adepoju*, 756 F.3d 250. Savage's reliance on *Adepoju* is misplaced. Although *Adepoju* did involve multiple phones, identity theft, and a would-be insider at a bank, Savage's scheme is more complex. Savage took several steps to conceal his own identity and distance himself from the scheme, including using a phone registered to someone else and using at least two check runners. In his videotaped conversation with Conteh's mother, Savage also admitted to either storing money in Africa or having the means to disguise the source of his money.

25

victims' accounts to conceal and execute the scheme—far more than is required for a bank fraud conspiracy conviction. *See* 2A Kevin F. O'Malley, Jay E. Grenig & Hon. William C. Lee, *Federal Jury Practice and Instructions* § 47:11 (6th ed. 2018) (providing a pattern jury instruction for bank fraud conviction under 18 U.S.C. § 1344 requiring that (1) the defendant knowingly executed a scheme or artifice to defraud a financial institution, or knowingly executed a scheme to obtain the money, funds, or property owned by or under the control of a financial institution, by means of material false or fraudulent pretenses, representations, or promises; (2) the defendant did so with the intent to defraud; and (3) the financial institution was a federally insured or chartered bank). As the district court stated, "It was not the most complex fraud scheme, but certainly I believe that it was sophisticated enough that the Government has met its burden of proof . . . ." J.A. 2411. The evidence, taken together, compels us to conclude that the district court did not clearly err in applying the 2-level sentencing enhancement based on use of sophisticated means.

D.

Next, Savage asserts that the district court erroneously applied a 3-level sentencing enhancement based on his role in the offense as a manager or supervisor. U.S.S.G. § 3B1.1(b) provides a 3-level enhancement "[i]f a defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive . . . ." "Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the

26

crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4. This Court has explained that "the enhancement is justified if the defendant managed or supervised the activities of at least one other person in a scheme that involved five or more participants." *United States v. Bartley*, 230 F.3d 667, 673 (4th Cir. 2000) (citations omitted).

Savage argues that there is no evidence in the record to support finding that he was a manager or supervisor; he does not challenge the district court's finding that five or more participants were involved. At a minimum, however, the trial evidence demonstrates that Savage helped recruit Conteh, directed her efforts in the scheme, and delivered proceeds from the fraud to her. This alone is sufficient to support finding that Savage managed or supervised the activities of at least one person. It is also uncontested that the scheme involved five or more participants; Savage and Sadique planned the scheme, Conteh accessed the customer accounts, and at least two other individuals redeemed fraudulent checks at Capital One locations. Therefore, we hold that the district court did not clearly err in applying a 3-level sentencing enhancement for Savage's role as a manager or supervisor.

E.

Finally, Savage asserts that the district court abused its discretion by requiring part of Savage's sentences to run consecutively. Savage was convicted on Counts Two and Three of aggravated identity theft, in violation of 18 U.S.C. § 1028A. Section 1028A carries a mandatory consecutive sentence of two years. 18 U.S.C. § 1028A(a)(1), (b)(2).

Section 1028A(b)(4) provides that:

> a term of imprisonment imposed on a person for a violation of this section may, in the discretion of the court, run concurrently, in whole or in part, only with another term of imprisonment that is imposed by the court at the same time on that person for an additional violation of this section . . . .

In determining whether multiple counts of § 1028A should run concurrently with or consecutively to each other, the court should consider factors including the "nature and seriousness of the underlying offenses," U.S.S.G. § 5G1.2 cmt. n.2(B)(i), and "[w]hether the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2) are better achieved by imposing a concurrent or a consecutive sentence," U.S.S.G. § 5G1.2 cmt. n.2(B)(iii). The purposes of sentencing enumerated in § 3553(a)(2) include "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and "to afford adequate deterrence to criminal conduct . . . ." 18 U.S.C. § 3553(a)(2)(A), (B).

The district court determined that 12 months of the mandatory 24-month sentence for Savage's conviction on Count Three for aggravated identity theft should run consecutive to the mandatory 24-month sentence imposed on Count Two for aggravated identity theft, resulting in a combined 36-month sentence on these two counts.

Savage argues that the district court necessarily erred in determining that part of the sentence should run consecutively because it erred in applying the sentencing enhancements discussed above. Because we now uphold each of the challenged sentencing enhancements, however, Savage's argument collapses. Additionally, even if we had concluded that the district court erred in applying any of these challenged

sentencing enhancements, there is no indication that the district court abused its discretion because it specifically identified its reasons for providing a partial-consecutive sentence, and many of these reasons were unrelated to the sentencing enhancements. For example, in considering the § 3553(a)(2) factors, the district court noted that the government had not sought the maximum sentence, that "[t]he nature and circumstances of the offense are serious," that Savage "was a leader, an organizer of a significant and fraudulent criminal group," that the crime compromised the victims' credit and confidence in our banking system and security, and that Savage and defendants like him need to be deterred from engaging in this kind of fraudulent conduct. JA. 2441–44. Therefore, we hold that the district court did not abuse its discretion by requiring that part of the sentences for Counts Two and Three run consecutively.

## VI.

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED*.